[No. B097536. Second Dist., Div. Three. Aug. 28, 1996.]

HOWARD LIPTON et al., Petitoners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LAWYERS' MUTUAL INSURANCE COMPANY, Real Party in Interest.

**COUNSEL**

Mazursky, Schwartz & Angelo, Christopher E. Angelo, and Scott A. Marks for Petitioners.

No appearance for Respondent.

Musick, Peeler & Garrett, Harry W. R. Chamberlain II and Mary Catherine M. Bohen for Real Party in Interest.

Robie & Matthai, Pamela E. Dunn, Bottum & Feliton, John R. Feliton, Jr., Kenneth C. Feldman, Murray J. Robertson, Haight, Brown & Bonesteel, Roy G. Weatherup, Marcus M. Kaufman, Gregory F. Stannard, O'Flaherty & Belgum, Robert M. Dato, Zelle & Larson, Alex M. Duarte, Debra J. Hall, George M. Brady III and Anthony J. Mormino as Amici Curiae on behalf of Real Party in Interest.

**OPINION**

**CROSKEY, J.**—In this bad faith action against his professional liability insurer, the petitioner Howard Lipton[1] seeks a writ of mandate compelling the trial court to require the real party in interest, Lawyers' Mutual Insurance Company (LMIC), to produce certain records relating to liability "reserves" which may have been established in a malpractice action brought against Lipton, together with "corresponding reinsurance records." The trial court, after conducting an in camera inspection of the requested records, denied Lipton's discovery request, stating that "it does not appear that the disclosure of setting reserves is likely to lead to [the discovery of] admissible evidence," and that the "percentage of its risk that [LMIC] assigns to other carriers is of no moment."

After a review of the record, we conclude that the trial court erred in denying Lipton any discovery as to the requested reserve and reinsurance documents. We hold, at least for purposes of discovery (Code Civ. Proc., § 2017, subd. (a)), loss reserve information cannot be deemed, a priori, irrelevant. Such information may well lead to the discovery of evidence admissible on the issues raised by Lipton in his bad faith action against LMIC.

The same is true with respect to Lipton's demand for production of reinsurance documents although the relevancy issue is more problematic. However, the trial court improperly reached the general conclusion that such documents had no relevancy whatever. As is the case with loss reserves, documents relating to reinsurance must each be evaluated in the context of the *discovery* standard of relevancy. However, reinsurance documents will often present an additional, more difficult problem for a party seeking disclosure. They may involve claims of qualified and/or absolute privilege which the trial court, in generally denying Lipton's motion to compel, did not address.

We therefore shall grant a peremptory writ of mandate directing the trial court to vacate its order of denial and to conduct further proceedings in accordance with the views expressed herein.

---

[1]In addition to Howard Lipton, his professional corporation, Howard Lipton, P.C., doing business as Action Law, is also a petitioner in this matter. For convenience, we refer to both petitioners as "Lipton."

FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 18, 1990, David and Deanna Pacheco were riding on David's 1980 Yamaha motorcycle when they collided with a 1974 Chevrolet truck. They both suffered personal injuries as a result of this accident. They retained Lipton to represent them in an action for damages on a contingency fee basis.

Due to their subsequent unhappiness with (1) Lipton's settlement of the case against the driver of the truck, (2) his failure to bring a product liability claim against Yamaha, and (3) certain misrepresentations of fact which he allegedly made to induce them to retain his services in the first place, the Pachecos, on November 21, 1991, filed a 16-count complaint against Lipton.

In that action, they alleged counts for legal malpractice, intentional and negligent misrepresentation, conversion, breach of the implied covenant of good faith, spoliation of evidence and conspiracy. All of these counts related to Lipton's acts and omissions in connection with his legal representation of the Pachecos and their claim for damages. They sought recovery of attorney fees paid to Lipton, economic and noneconomic damages and punitive damages, all in excess of $7 million.

Lipton tendered defense of the action to his insurer, LMIC. Counsel was appointed to represent him, although LMIC issued a reservation of rights letter with respect to the fraud and punitive damage claims. Lipton requested appointment of separate *Cumis* counsel. (*San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913].) This request was approved by LMIC.

LMIC had issued successive professional liability policies to Lipton covering the annual periods April 20, 1990, to April 20, 1991, and April 20, 1991, to April 20, 1992. The policies covered professional errors and omissions by Lipton which resulted in *claims made and reported* during the policy period. The policy limits of liability were $250,000 for "each claim" and $750,000 "aggregate" during any policy period. The policies also had a "burning limits" provision whereby the payment of defense costs would reduce the available limits for each claim *after* exhaustion of a $50,000 claim expense allowance applicable to all claims submitted during the policy period.[3]

---

[2]There is no dispute as to the operative facts upon which Lipton's request for a writ of mandamus is based.

[3]The policies defined the terms "claim" and "multiple claim" as follows with respect to the limits of liability available for all "related claims":

"Whenever used in this policy the term

"1.1 'Claim' means: a demand including service of suit or institution of arbitration

Although the record reflects that some efforts were made to effect a settlement of the Pacheco action,[4] they were not successful. The case went to trial in January 1994 and resulted in a jury verdict against Lipton for compensatory and punitive damages in excess of $14 million. Prior to entry of the judgment, LMIC notified Lipton that $278,427 had been paid out as claim expenses and thus the applicable policy limit had been reached.[5]

Lipton asserts that the Pacheco case involved a number of multiple claims which occurred over *two* policy periods, and therefore LMIC's total policy limit exposure was $1.5 million, not merely $250,000. In addition, he contends that LMIC had an opportunity to settle the Pacheco case for $250,000 and failed to do so. Based on those contentions, Lipton filed this action against LMIC on January 12, 1995, alleging that LMIC's actions with respect to the handling of the Pacheco defense amounted to a breach of the implied covenant of good faith.[6]

---

proceedings, for money against an Insured. *A Multiple Claim shall constitute one Claim for purposes of this policy. . . .*

"*. . . . . . . . . . . . . . . . . . . . . . . .*

"1.13 'Multiple Claim' means: *two or more demands received by the Insured for money,* including service of suit or institution of arbitration proceedings against the Insured, *arising out of a single act, error or omission or Personal Injury or a series of related acts, errors, omissions or Personal Injuries, whether such demands are made against one or more Insureds or whether such demands are made by one or more persons or organizations. . . ."*

"4.1 Limit of Liability - Each Claim

"The liability of the Company for each Claim First Made Against The Insured During The Policy Period And Reported In Writing To The Company During The Policy Period shall not exceed the amount stated in the Declarations for each Claim . . . .

"*. . . . . . . . . . . . . . . . . . . . . . . .*

"4.3 Multiple Insureds, Claims and Claimants.

"A Multiple Claim shall be one Claim for all purposes of this policy. The inclusion in a Claim of more than one Insured or *the making of demands by more than one person or organization shall not operate to increase the Company's limit of liability.*" (Italics added.)

[4]In a dispute which is not relevant to the issues before us, LMIC contends that Lipton, who had the right under the policy to withhold consent to any settlement, did not give such consent until February 1993. By that time, defense expenditures had reduced the available indemnity limit to $160,000. An offer in that amount was rejected by Pacheco in April 1993.

[5]In addition, LMIC had also defended Lipton in two other malpractice actions which had been brought against him. One, Hill v. Lipton (Super. Ct. L.A. County, No. SC021169), was filed in October 1991 and was settled for $500 after claim expenses by LMIC of $3,319.33. The other, Dale v. Lipton (Super. Ct. Riverside County, No. 217462), was settled in January 1993 for $105,000 after claim expenses of $18,253.67 were paid out by LMIC.

[6]Records produced by Lipton during discovery in this action reflect that Lipton, prior to the filing of this action, had entered into an agreement with the Pachecos and their counsel which provided that the Pachecos would stay enforcement of their judgment against Lipton in exchange for a 40 percent share in the proceeds of any settlement or judgment entered in this action. Under this arrangement, Lipton would receive 20 percent of any recovery, with the remaining 40 percent to be paid to Lipton's counsel. This agreement also expressly provides

In addition, Lipton alleged causes of action for intentional and negligent spoliation of evidence based on LMIC's failure to recognize that the multiple claims of the Pacheco action entitled Lipton to "aggregate" (rather than "single") claim coverage and that LMIC intentionally and negligently kept evidence of such additional coverage, including "reserves" and related reinsurance documentation, from Lipton, thereby depriving him of evidence demonstrating greater coverage, the knowledge of which would have permitted the settlement of the Pacheco action within policy limits.

Prior to filing this action, Lipton had demanded that LMIC produce its claim file in the Pacheco action. After obtaining Lipton's consent (as required by Ins. Code, § 791.13), LMIC produced certain file materials. Along with this production, LMIC also delivered a privilege log which listed 24 documents it had withheld from production on the basis that they contained (1) reserve information which was not relevant to the issues presented by Lipton's bad faith action, and (2) reinsurance information which included sensitive proprietary material and/or reflected attorney-client communications.[7]

On April 12, 1995, Lipton noticed a motion to compel production of the reserve and related reinsurance documents described in the privilege logs submitted by LMIC in the Pacheco, Hill and Dale actions.[8] LMIC objected to the request for production on the ground that information regarding reserves and reinsurance was neither relevant nor admissible and thus, as a matter of law, was not discoverable. LMIC also contended that the reinsurance documents included privileged matter.[9]

When Lipton's motion came on for hearing, the trial court appointed a referee (retired Los Angeles Superior Court Judge Peter Smith) to hear the

---

that neither the Pachecos nor Lipton are permitted to resolve the claims between them or with LMIC without the prior consent of both counsel.

[7]A similar request was received by LMIC several months later for the claim files in both the Hill and the Dale actions. (See fn. 5, *ante.*) LMIC produced certain documents from these files plus privilege logs describing an additional 10 documents withheld on the same grounds. (See fn. 9, *post.*)

[8]Lipton argued that the loss reserve and reinsurance documents constituted relevant and admissible evidence to prove (1) LMIC's state of mind regarding its claims handling practices; (2) LMIC's knowledge that aggregate coverage versus singular coverage applied for the benefit of Lipton and his firm but that such knowledge was concealed from both; and (3) the degree to which LMIC ignored its own counsel's advice regarding Lipton's probable liability with over-limits exposure. Lipton argues that "these are crucial issues that directly bear on [LMIC's] breach of the implied covenant of good faith and fair dealing and spoliation of evidence."

[9]An examination of the privilege logs produced by LMIC reflects that substantially all of the documents which are the subject of this dispute contain both reserve and reinsurance information. The log for the Pacheco action included 24 separate documents: (1) File cover/reinsurance diary (Dec. 19, 1991); (2) master claim record (including reserve/reinsurance information) (Apr. 2, 1992); (3) master claim record (including reserve/reinsurance

matter pursuant to Code of Civil Procedure section 639, subdivision (e). The referee, with but one minor and irrelevant exception, sustained LMIC's objections to production of the reserve and reinsurance documentation in all three files. However, in doing so, he rejected LMIC's contention that reserve and reinsurance documents are never discoverable. The referee relied on the decision in *Fireman's Fund Ins. Co.* v. *Superior Court* (1991) 233 Cal.App.3d 1138 [286 Cal.Rptr. 50] (hereafter *Fireman's Fund*), which held that it was an abuse of the trial court's discretion to order production of reinsurance documents without first holding an in camera inspection "to determine whether they were of any value to the [the plaintiff's] case and whether sensitive matter should be excised before disclosure." (*Id.* at p. 1141.)[10] The referee held that the reasoning in *Fireman's Fund* should also apply to documentation relating to loss reserves.[11]

---

information) (July 25, 1989); (4) claims history information (Nov. 12, 1991); (5) instruction memo (including reserve/reinsurance information) (Feb. 24, 1992); (6) letter to King, Shapiro (outside counsel) from Bill Meisen of LMIC (Apr. 7, 1992); (7) memo to Cruz/Meisen from Bernhardt re reinsurance update (Mar. 27, 1992); (8) instruction memo (including reserve/ reinsurance information) (Apr. 2, 1992); (9) memo to Cruz/Meisen from Bernhardt re reinsurance update (Mar. 27, 1992; (10) memo to Cruz/Meisen/Sargent from Bernhardt re potential reservation of rights letter (Jan. 24, 1992); (11) memo to reinsurers from Bernhardt re precautionary report (Dec. 12, 1991); (12) instruction memo (including reserve/reinsurance information) (Apr. 30, 1993); (13) instruction memo (including reserve/reinsurance information) (Mar. 26, 1993); (14) handwritten memo to Cruz from Sproat re reserve change error (Feb. 8, 1993); (15) master claim record (including reserve/reinsurance information) (Feb. 23, 1993); (16) master claim record (including reserve/reinsurance information) (Jan. 27, 1994); (17) instruction memo (including reserve/reinsurance information) (Jan. 26, 1994); (18) instruction memo (including reserve/reinsurance information) (Sept. 27, 1993); (19) handwritten to file from Bernhardt re: conversation with house counsel (Jan. 29, 1992); (20) instruction memo (including reserve/reinsurance information) (Feb. 19, 1993); (21) instruction memo (including reserve/reinsurance information) (Feb. 22, 1993); (22) last page of retainer agreement (with marginalia re: conversation with house counsel) (undated); (23) memo to GK/ME/RC/JF from Bernhardt re trial referral memo (including information re: reserves/ reinsurance and communications with outside counsel) (June 8, 1993); (24) memo to Cruz/ Meisen from Bernhardt re reinsurance update (Mar. 27, 1992).

The log for the Hill case contained six items and the log for the Dale case contained four items. The items in these two logs were described as either "Master Claim Record" (containing "reserve and reinsurance information") or "Claims history information" (containing "reserve information").

[10]Specifically, the *Fireman's Fund* court stated, "We agree with [the insured] that communications between the reinsurers and Fireman's Fund about the [underlying third party] claim *may be* relevant to the bad faith cause of action. But they may be irrelevant or entirely innocuous, and they may contain sensitive commercial information. The court abused its discretion in ordering disclosure of these and other reinsurance documents without first reviewing them in camera [citation] to determine whether they were of any value to [insured's] case and whether sensitive matter should be excised before disclosure." (233 Cal.App.3d at p. 1141, italics in original.)

[11]Except for item 4 listed in the Pacheco log (see fn. 9, *ante*), which the referee ordered LMIC to produce, LMIC's assertion of privilege was sustained as to all of the documents listed on the three logs. As we note below, however, the referee's explanation of his ruling

The referee concluded: "After reviewing the documents in camera it does not appear that the disclosure of setting of reserves is likely to lead to admissible evidence.[12] The documents reflect that from the inception the defendant took the defense of its insured quite seriously. Three days after receiving the claim a six figure reserve was set on the matter. Several months before the trial the reserves were at the policy limits of 300,000 (250,000 + 50,000 claim expenses allowance). [¶] In light of the fact that defendant set realistic reserves for its insured the discovery of reinsurance data becomes ever more dubious. What percentage of its risk that defendant assigns to other carriers is of no moment. [¶] Under no circumstances did the number of claims against plaintiff trigger the $750,000 aggregate limits."[13]

Lipton asked the trial court to overrule the referee's decision and order production of LMIC's reserve and reinsurance documentation in all three of

appears to be that discovery was denied as to these items due to a lack of relevancy. Due to this apparent inconsistency, and because many of the documents described in the logs clearly appear to contain potentially privileged matter, we will discuss both issues. Since it appears that the privilege claim in this case applies only to the reinsurance documents, our discussion of the discoverability of information relating to loss reserves will be limited to the question of relevancy.

[12]This conclusionary statement is neither supported nor explained and is inconsistent with another part of the referee's ruling which states that LMIC's *"privilege"* objection was sustained. We are unaware of any applicable privilege which might preclude discovery of LMIC's loss reserve information or documents and, in any event, LMIC has made no such claim.

[13]This latter conclusion appears to be based upon the referee's acceptance of LMIC's contention that Lipton's multiple claim argument was clearly without merit. The Supreme Court, in *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854 [21 Cal.Rptr.2d 691, 855 P.2d 1263], construed nearly identical policy language (see fn. 3, *ante*) and concluded that a suit against an attorney for his multiple but related acts of professional negligence constituted but a single claim under his liability policy. Quoting from the relevant policy language, the court stated, " 'The inclusion herein of more than one [i]nsured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. Two or more claims arising out of a single act, error or omission . . . shall be treated as a single claim.' Under this language, if an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability. It would be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors." (5 Cal.4th at p. 861.)

In this case, it appears that all of Lipton's alleged professional errors were "related" to his representation of David and Deanna Pacheco in their claim to recover for the injuries which they sustained in the 1990 motorcycle accident. Given that the LMIC policy involved here expressly provides that multiple claims arising out of "related" acts would not increase LMIC's liability limits (see fn. 3, *ante*), it would appear that the *Bay Cities* reasoning has equal application to this case. In addition, Lipton's argument that the Pachecos' allegations of multiple acts of negligence occurring over two policy periods entitled him to benefit of multiple policy limits ignores the fact that the LMIC policy is a *"claims made and reported"* not an occurrence policy. The record reflects that the claims against Lipton were all made by the Pachecos and reported to LMIC during the same policy period.

the cases. At a hearing held on September 22, 1995, the court denied Lipton's request, overruled his objections to the referee's report and adopted that report as the order of the court. The trial court's order was entered on September 28, 1995.

Lipton then petitioned this court for a writ of mandate. We issued an alternative writ on December 14, 1995, and set the matter for hearing.

### ISSUES PRESENTED

There are two relatively novel questions presented by the instant petition. The first is whether documents regarding a liability insurer's (1) reserves and (2) agreements of reinsurance and related correspondence are precluded from discovery, as a matter of law, in an insured's bad faith action? Second, if such documents are potentially discoverable, should such discovery be made subject to the trial court's in camera inspection to determine (1) whether the requested documents have any relevance to the requesting party's case and/or (2) whether privileged material should be excised before disclosure or made subject to a protective order?

### DISCUSSION

### 1. *Standard of Review*

The standard for determining the scope of discovery is set forth in the statute. "Unless otherwise limited by order of the court in accordance with this article, any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. . . ." (Code Civ. Proc., § 2017, subd. (a).) "The court shall limit the scope of discovery if it determines that the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence. . . ." (Code Civ. Proc., § 2017, subd. (c).)

For discovery purposes, information is relevant if it "might reasonably assist a party in *evaluating* the case, *preparing* for trial, or *facilitating* settlement." (2 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1996) ¶ 8:66.1, p. 8C-1, first and second italics original, last italics added (hereafter Civil Procedure Before Trial).) Admissibility is *not* the test and information, unless privileged, is discoverable if it

might reasonably *lead* to admissible evidence. (*Davies* v. *Superior Court* (1984) 36 Cal.3d 291, 301 [204 Cal.Rptr. 154, 682 P.2d 349].) The phrase "reasonably calculated to lead to the discovery of admissible evidence" makes it clear that the scope of discovery extends to *any information* that reasonably might lead to other evidence that would be admissible at trial. "Thus, the scope of permissible discovery is one of *reason, logic and common sense.*" (Weil & Brown, Civil Procedure Before Trial, *supra*, ¶ 8:67, p. 8C-2, italics in original.) These rules are applied liberally in favor of discovery. (*Colonial Life & Accident Ins. Co.* v. *Superior Court* (1982) 31 Cal.3d 785, 790 [183 Cal.Rptr. 810, 647 P.2d 86].)

"Code of Civil Procedure section 2031, which governs production of documents, authorizes a court 'for good cause shown' to 'make any order that justice requires to protect any party or other natural person or organization from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense.' (§ 2031, subd. (e).) The section specifically [authorizes] a court to protect confidential 'commercial information' from unwarranted disclosure. (§ 2031, subd. (e)(5).) The court may order items produced under seal and opened only on order of the court after in camera review. (§ 2031, subd. (e)(6))." (*Fireman's Fund, supra*, 233 Cal.App.3d at p. 1141.)

Management of discovery generally lies within the sound discretion of the trial court. (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 380 [15 Cal.Rptr. 90, 364 P.2d 266]; *Philippine Export & Foreign Loan Guarantee Corp.* v. *Chuidian* (1990) 218 Cal.App.3d 1058, 1084 [267 Cal.Rptr. 457].) Where there is a basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court. (*Philippine Export, supra*, 218 Cal.App.3d at p. 1084.) The trial court's determination will be set aside only when it has been demonstrated that there was "no legal justification" for the order granting or denying the discovery in question. (*Carlson* v. *Superior Court* (1961) 56 Cal.2d 431, 438 [15 Cal.Rptr. 132, 364 P.2d 308]; see also *Sav-On Drugs, Inc.* v. *Superior Court* (1975) 15 Cal.3d 1, 7 [123 Cal.Rptr. 283, 538 P.2d 739].)

Finally, we believe the issues raised by the instant petition are both sufficiently novel and important to justify review by prerogative writ. (See *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 169 [84 Cal.Rptr. 718, 465 P.2d 854].)

2. *Discovery of Documents Relating to the Setting of Loss Reserves*

By law, insurers conducting business in California are required to establish and maintain reserves. Under Insurance Code section 923.5, these

statutorily compelled reserves are the "amount *estimated* in the aggregate to provide for the payment of all losses and claims for which the insurer may be liable, and to provide for the expense of adjustment or settlement of losses and claims." (Italics added.)[14] The statute further requires that reserves be computed in accordance with regulations promulgated by the Insurance Commissioner, based "*upon reasonable consideration of the ascertained experience and the character of such kinds of business for the purpose of adequately protecting the insured and securing the solvency of the insurer.*" (*Ibid.*, italics added; see generally, *In re Couch* (S.D.Cal. 1987) 80 Bankr. 512, 516-517.) Pursuant to this statutory authority, the commissioner has promulgated a series of regulations for liability insurers. (See Cal. Code Regs., tit. 10, § 2319 et seq.) Among other things, the commissioner requires that reserves "reflect inflation and development" projected to the date of possible ultimate payment, incurred-but-not-reported losses and ratios of paid expenses to paid losses. (Cal. Code Regs., tit. 10, § 2319.2.)

Loss reserves, which are the "reserves" to which Lipton refers, and to which he directs his petition, represent the amount anticipated to be sufficient to pay all obligations for which the insurer may be responsible under the policy with respect to a particular claim. That amount necessarily includes expenses that are likely to be incurred in connection with the settlement or adjustment of the claim, as well as the legal fees and other costs required to defend the insured. As already noted, they are statutorily compelled estimates and are likely to be frequently adjusted during the course of the litigation. Thus, a particular reserve amount may be substantially more or less than the amount ultimately paid on a particular claim.

"A common misconception is that an insurer's loss reserves are the same as settlement authority. They are not. The main purpose of a loss reserve is to comply with statutory requirements and to reflect, as accurately as possible, the insured's *potential* liability. It does not automatically authorize a settlement at that figure." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) ¶ 1:120 at p. 1-20, italics in original.) Moreover, "a reserve cannot accurately or fairly be equated with an admission of liability or the value of any particular claim." (*In re Couch, supra*, 80 Bankr. at p. 517.)

---

[14]Insurance Code section 923.5 provides in pertinent part: "Each insurer transacting business in this state shall at all times maintain reserves in an amount estimated in the aggregate to provide for the payment of all losses and claims for which the insurer may be liable, and to provide for the expense of adjustment or settlement of losses and claims. [¶] The reserves shall be computed in accordance with regulations made from time to time by the commissioner. . . . The commissioner shall make the regulations upon reasonable consideration of the ascertained experience and the character of such kinds of business for the purpose of adequately protecting the insured and securing the solvency of the insurer. . . ."

■ Thus, such evidence may or may not be relevant in a subsequent bad faith action, depending on the issues presented. For example, in a case where the insurer has denied coverage and refused a defense, the *fact* that a reserve had been set by the insurer might well be relevant to show that the insurer must have had some knowledge that a *potential* for coverage existed. (*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240 [178 Cal.Rptr. 343, 636 P.2d 32]; *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 753 [161 Cal.Rptr. 322].)[15] In addition, an argument can be made for the proposition that loss reserve information might have *some* relevance to the question of whether a reasonable likelihood of an excess verdict existed or the insurer had conducted a proper investigation or given reasonable consideration to all of the factors involved in a specific case which might expose its insured to an excess verdict.[16] On the other hand, depending on the circumstances of a particular case, there may be no relevance whatever. However, these are all questions of relevancy which are related to the trial and the *admissibility* of evidence.

■ None of the authorities cited to us have dealt with the issue of *discovery* relevance under *California* law. We cannot conclude, as LMIC contends, that loss reserve information has no discovery relevance, as that term is defined and applied under Code of Civil Procedure section 2017, subdivision (a). The evaluation of a case made by an insurer, whether compelled by law or business prudence, is information which might well lead to discovery of evidence admissible on any number of issues which commonly are presented in bad faith actions.

---

[15]In *Miller*, the insurance company's claims manager gave testimony that the insurer foresaw a potential liability and duty to defend its insured in the lawsuit, established a $42,000 "reserve fund" to defend the claim, and made offers to settle with another insurer which paid a portion of the property damage. The establishment of the defense reserve was only one of several "indications that Elite perceived a possible duty to defend. . . ." (*Miller* v. *Elite Ins. Co.*, *supra*, 100 Cal.App.3d at pp. 749, 753.) *Samson* also found that the establishment of a defense reserve fund was "*an indication* that the company was aware of its responsibility to defend its insured." (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d at p. 240, italics added.)

[16]An example where the amount of reserves set by an insurer will likely be relevant is in that particular bad faith action brought by an insured employer against its workers' compensation carrier in which it is claimed that the insurer has failed to act reasonably or fairly in the adjustment and settlement of employee claims. (See, e.g., *Security Officers Service* v. *State Compensation Ins. Fund* (1993) 17 Cal.App.4th 887, 898 [21 Cal.Rptr.2d 653]; *Mission Ins. Group, Inc.* v. *Merco Construction Engineers, Inc.* (1983) 147 Cal.App.3d 1059, 1066 [195 Cal.Rptr. 781].) In such cases, the amount of the reserves set by the insurer and its loss experience directly affect the amount of the insured's premiums and/or the dividends to which the insured might otherwise be entitled. " 'When an insurance policy contains a retrospective premium feature, an insurer's failure to act reasonably when adjusting claims automatically subjects the insured to greater financial obligations in the form of increased premium rates.' [Citation.]" (*Security Officers Service*, *supra*, 17 Cal.App.4th at p. 897.) In such a case, the setting of reserves can be directly related to the insured employer's damages.

We are not unmindful of the reasonable concerns an insurer may have that its compliance with the statutory requirements for setting and adjusting loss reserves may well force it into the making of an "admission" which might be introduced against it in a subsequent dispute with its insured. LMIC argues, "If reserve information were construed as some form of 'admission' regarding liability [or the value of the underlying claim], and thus discoverable for any purpose by the policyholder, the candid establishment of reserves by insurers would be severely and detrimentally impacted. Insurers would be faced with a Hobson's Choice: To avoid or minimize any potential 'admissions' of liability, reserves would have to be set for amounts that were unrealistically low. To avoid later contentions of 'bad faith' reserves would have to be set at maximum levels irrespective of available defenses to the claims asserted—and would be 'evidence' of bad faith if not offered before trial."

This argument fails here for several reasons. First, the method of establishing and amount of claims reserves is guided by statute. (Ins. Code, § 923.5). The amount of reserves carried at any specific time cannot be arbitrary. The insurer must reasonably estimate the amount necessary to provide for the payment of all losses and claims for which the insurer may be liable. It must reasonably provide for the expense of adjustment or settlement of losses and claims. (*Ibid.*). Second, each insurer transacting business in the State of California is required to disclose the amount of its reserves each year in its annual statement which is filed with the Department of Insurance. (Ins. Code, § 923.) Third, the Insurance Commissioner, by regulations promulgated by the Department of Insurance, requires each company to: (a) establish an effective method for testing the adequacy of loss and loss expense reserves (Cal. Code Regs., tit. 10, § 2319.1) and (b) comply with the prescribed methodology of computing reserves (Cal. Code Regs., tit. 10, § 2319.2). The commissioner is empowered to audit claims reserves of any insurer doing business in this state. (Cal. Code Regs., tit. 10, § 2319.4.) The power of the Commissioner of Insurance to regulate reserves is a strong disincentive to the establishment of unrealistically low or high reserves. Finally, LMIC's argument is really directed to the limitation or exclusion of loss information *at trial*.[17] It does not respond to Lipton's pretrial discovery demand.

LMIC's only objection to the production of the reserve information (and the only basis on which the trial court apparently excluded it) was lack of

---

[17]Furthermore, even if the trial court admits reserve information in evidence the insurer would not be foreclosed from fully explaining through competent testimony, the reason the reserve was established, the reasonableness of the amount of the reserve, the allocation between indemnity and loss adjustment expense and any other evidence relevant to the issue from the insurer's standpoint.

relevancy. The trial court's blanket preclusion of loss reserves discovery on the ground of a lack of relevancy was error. On the record before us, the conclusion that the requested loss reserve information might reasonably lead to the discovery of evidence admissible with respect to one or more of the three issues relied upon by Lipton (see fn. 8, *ante*) seems inescapable. Without doubt such information would assist Lipton in *evaluating* his bad faith case and in *preparing* it for trial. That is enough to justify discovery. (*Gonzalez* v. *Superior Court* (1995) 33 Cal.App.4th 1539, 1546 [39 Cal.Rptr.2d 896].) Whether such information is sufficiently relevant to the precise issues which will be presented at trial to be admissible in evidence is another matter. That is not the question before us.

Thus, Lipton is entitled to discovery of the requested loss reserve information unless the trial court can, as a matter of law, conclude (as to each separate item of information) that it is not relevant to the subject matter or is not calculated to lead to the discovery of admissible evidence in Lipton's bad faith action. However, the record indicates that such reserve information in some of the documents may be commingled with reinsurance information and privileged matter. We therefore now turn to that issue.

### 3. *Discovery of Reinsurance Documents*

■ The documents relating to reinsurance which Lipton seeks involve reinsuring agreements LMIC may have entered into plus any related correspondence regarding the adjustment and defense of the Pacheco, Hill and Dale cases which LMIC may have sent to its reinsurers. In his petition, Lipton argues, "It is undisputed that the defendant did, in fact, enter into at least one, if not more, reinsurance agreements with other carriers pertaining to its defense of Mr. Lipton. These types of communications with reinsurers would not have occurred unless defendant Lawyer's Mutual knew or had a good faith belief, that aggregate coverage benefits were owed, or may be owed, to Mr. Lipton."

It appears that Lipton's argument for discovery of reinsurance information is that it is relevant to explaining the definition of "single" versus "aggregate" claims. This argument strongly suggests that Lipton does not understand the fundamental purpose and function of reinsurance. LMIC's entry into reinsuring agreements would not have occurred in response to the existence of a pending claim, but would necessarily have occurred *prior to* the claim. ■ A reinsurance agreement is, to put it simply, a contract by

which one insurer transfers a *risk* (and a right to receive the related premium) to another insurer willing to accept both.[18]

"Reinsurance occurs when one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites, pursuant to a policy or a group of policies, to another insurer. [Citations.] The reinsurer agrees to indemnify the ceding insurer on the risk transferred. [¶] The purpose of reinsurance is to diversify the risk of loss [citation], and to reduce required capital reserves. [Citation.] Spreading the risk prevents a catastrophic loss from falling upon one insurer. By reducing the legal reserve requirement, the ceding insurer then possesses more capital to invest or to use to insure more risks. [Citation.]" (*Unigard Sec. Ins. Co.* v. *North River Ins. Co.* (2d Cir. 1993) 4 F.3d 1049, 1053.)

"A reinsurance contract is presumed to be a contract of indemnity *for the benefit of the insurance company;* the original insured has no interest in it." (*Ascherman* v. *General Reins. Corp.* (1986) 183 Cal.App.3d 307, 311 [228 Cal.Rptr. 1], italics added; cf. Ins. Code, § 623; *Travelers Indem. Co.* v. *Gillespie* (1990) 50 Cal.3d 82, 95 [266 Cal.Rptr. 117, 785 P.2d 500].) As already noted, the purpose of this arrangement is to allow the ceding company to reduce its statutory reserve requirements for existing policies and thereby undertake additional risks by issuing policies to a greater number of insureds. (See *American Re-insurance Co.* v. *Insurance Com'n, etc.* (C.D.Cal. 1981) 527 F.Supp. 444, 452-453.) However, the reinsurance contract does not alter the original or ceding insurer's relationship with its policyholder. Claims by the insured are paid by the ceding insurer who in turn is paid by the reinsurer. The reinsurer "follows the fortunes" of the original insurer and generally cannot assert coverage defenses after the ceding insurer has settled a claim. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 1:46 to 1:47, p. 1-8.)

As a result of these circumstances, an argument can be made that reinsurance documents, such as those requested here, have no relevance to the subject matter of the action and are not likely to lead to the discovery of admissible evidence when the issue raised by the plaintiff is whether there is "single" or "aggregate" coverage. However, that is not to say that all documents containing reinsurance information are irrelevant to the subject matter of the lawsuit and are not calculated to lead to the discovery of admissible evidence. For example, correspondence between the insurer and reinsurer, not otherwise privileged, which discusses liability, exposure, the

---

[18]Insurance Code section 620 states: "A contract of reinsurance is one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance."

likelihood of a verdict in excess of policy limits or coverage issues may well be relevant in discovery for the same reasons reserve information may be discoverable. (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d 220, 240; *Miller* v. *Elite Ins. Co.*, *supra*, 100 Cal.App.3d 739, 753.)

■ However, where reinsurance documents include attorney-client or protected work product communications they would be entitled to the same privilege protection as would similar communications between the ceding insurer and its attorneys handling the insured's claim. (See *Aetna Casualty & Surety Co.* v. *Superior Court* (1984) 153 Cal.App.3d 467, 474 [200 Cal.Rptr. 471].) Communications to a reinsurer may contain advice from counsel for the ceding insurer relating to coverage, exposure and other liability issues.[19] These would, in all probability, be protected by the attorney-client privilege. Similarly, where the requested documents contain confidential commercial information a qualified privilege would be available to protect the documents unless the party requesting discovery can demonstrate a basis for overcoming such privilege.

As already discussed, one California case, which apparently only involved a claim of confidential commercial information, concluded that reinsurance documents *may* be relevant in a bad faith case. The court held, however, that it would be an abuse of discretion to permit any discovery of reinsurance documents or communications without the court first examining those documents and communications, by in camera inspection, to determine if they have sufficient relevance to the requesting party's case to overcome the insurer's claim of qualified privilege. (*Fireman's Fund*, *supra*, 233 Cal.App.3d at p. 1141.)[20]

---

[19]The Legislature has recognized the importance of fostering the free interchange of information between cedents and reinsurers. Insurance Code section 622 provides as follows: "Where an insurer obtains reinsurance, he must communicate all the representations of the original insured, *and also all the knowledge and information he possesses, whether previously or subsequently acquired, which are material to the risk.*" (Italics added.) Thus, reinsurance files may not only contain confidential commercial information regarding an insurer's financial condition, but also privileged attorney-client communications and protected work-product which ceding insurers *must* disclose to reinsurers.

[20]It must be noted that the court in *Fireman's Fund*, *supra*, relied on Code of Civil Procedure section 2031, subdivision (e), for requiring an in camera review of reinsurance documents by the court prior to disclosure. Section 2031, subdivision (e), authorizes the court to protect the insurer from disclosure of "confidential commercial information." For reasons not explained in the opinion, the court expanded this qualified privilege by referring to it as "sensitive commercial information" and information containing "sensitive matter." (*Fireman's Fund*, *supra*, 233 Cal.App.3d 1138, 1141.) We decline to extend the privilege beyond section 2031, subdivision (e), i.e., to "confidential business information."

### 4. *The In Camera Review Conducted by the Trial Court Was Not Adequate*

 In our view, an in camera review was the proper procedure to adopt in order to reach a resolution to the dispute between the parties where the requested documents contained both reserve and reinsurance information as well as claimed privileged matter. However, that review required the trial court to conduct, to the extent permitted by law or the agreement of the party claiming the privilege, a thorough examination of each of the requested documents for the purpose of making specific findings as to the applicable privilege, whether such privilege is absolute or qualified and, if a qualified privilege applies, the reasons for not permitting discovery. If discovery is to be denied based upon relevance, then the court must make specific findings as to why the documents are not relevant to the subject matter and not calculated to lead to the discovery of admissible evidence.

 While it is generally true that the court cannot compel disclosure of the contents of privileged documents in order to rule on the objection to a discovery request (Evid. Code, § 915; *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1990) 50 Cal.3d 31, 45, fn. 19 [265 Cal.Rptr. 801, 784 P.2d 1373]), it can and should determine all of the facts on which the claim of privilege depends.[21] The party claiming the privilege has the burden to show that the communication sought to be suppressed falls within the terms of the claimed privilege. (*D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 729 [36 Cal.Rptr. 468, 388 P.2d 700].) The party opposing the privilege must bear the burden of showing that the claimed privilege does not apply or that an exception exists or that there has been an expressed or implied waiver. (See, e.g., *Alpha Beta Co.* v. *Superior Court* (1984) 157 Cal.App.3d 818, 824-825 [203 Cal.Rptr. 752].) In addition, the court should resolve any factual disputes as to whether the party claiming a qualified privilege has established the basis therefor and whether the party seeking discovery has demonstrated an overriding need for disclosure. (See generally, *Gonzalez* v. *Superior Court, supra*, 33 Cal.App.4th at pp. 1548-1549.) In such a case, the court should determine whether a substantial need for the discovery exists (e.g., the information is relevant and cannot be obtained from any other source) which is greater than the policy considerations advanced by recognition of the claimed privilege or, in the case of a qualified work product privilege, "denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claims or defenses or will result in an injustice." (Code Civ. Proc., § 2018, subd. (b).)

---

[21]In this case, it appears that LMIC permitted the referee to examine all of the privilege log documents in order to enable him to rule on the objections to Lipton's motion to compel. That being so, such documents should be available for further judicial review on remand.

After the court determines that the requested information or documents, whether relating to reserves or reinsurance, are relevant for purposes of discovery, then discovery may be ordered subject to any claim of qualified or absolute privilege. The requested documents, if found to be relevant, can be ordered produced subject to any appropriate protective order (Code Civ. Proc., § 2031, subd. (e)) and/or a redaction as to all portions of the documents which may be subject to a qualified privilege (e.g., confidential commercial information or Code Civ. Proc., § 2018, subd. (b) work product for which an overriding need for discovery has not been demonstrated) or an absolute privilege (e.g., the attorney-client or Code Civ. Proc., § 2018, subd. (c) attorney work product privileges). This process can only be effectively accomplished by use of an in camera review.

## CONCLUSION

 The in camera review undertaken by the trial court in this case failed to meet or satisfy the principles we have discussed. Upon remand, the trial court should review the competing claims of the parties with respect to *each* of the requested documents which are the subject of Lipton's motion to compel. It should then require the production of the loss reserve and reinsurance information contained in the several documents described in LMIC's privilege logs which it determines to have relevance *in a discovery context*, subject to any qualified or absolute privilege which the court may find applicable to any of the documents involved. This can be accomplished by use of an appropriate redaction of documents and/or protective orders.

## DISPOSITION

The alternative writ is discharged. A peremptory writ shall issue directing the trial court to vacate its order of September 28, 1995, and to conduct further proceedings consistent with the views expressed herein. Lipton shall recover his costs.

Klein, P. J., and Aldrich, J., concurred.