

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DONALD BURDICK; SUSAN BYINGTON; LISA CARFAGNO; PETER and JANICE ELLIOT, and their marital community; BERNARD E. GOLDBERG; PAUL E. GOLSTEIN; TOM and LaVOE MULGREW, and their marital community; SUSAN ROSEN; MARTIN SILVERMAN; SHARON SILVERMAN; and BARRY and ROBIN STUCK, and their marital community, ) ) ) ) ) ) ) ) ) ) ) ) | DIVISION ONE<br><br>No. 73459-8-I<br><br><br>UNPUBLISHED OPINION |
| Appellants, ) ) | |
| v. ) ) | |
| ROSENTHAL COLLINS GROUP, LLC, an Illinois limited liability corporation, ) ) ) | |
| Respondent. ) ) | FILED: May 31, 2016 |

DWYER, J. — This appeal arises from a trial court order granting summary judgment dismissal of securities and negligence claims brought against Rosenthal Collins Group, LLC (RCG) for its alleged role in a Ponzi scheme fraud perpetrated by Enrique Villalba.[1] Because RCG was not involved in the sale of the securities herein at issue and owed no special duty to the investors in Villalba's scheme, we affirm.

---

[1] Relief is also sought from a protective order obtained by RCG prohibiting discovery of certain information related to the account involved in the fraud. We conclude that this order was proper.

I

A. Villalba's Ponzi Scheme

This case begins with the collapse of a Ponzi scheme perpetrated by Villalba, through his company Money Market Alternatives, LLC (MMA), from late 1996 until September 2009.

Villalba held himself out to investors as an "investment manager" who managed his clients' assets in accordance with their individual investment objectives and by utilizing his trading strategy, which he referred to as the "Money Market Plus Method." In reality, Villalba stole the money that he was supposedly managing. After receiving investors' funds into his bank accounts, Villalba used the funds to, among other things, pay himself huge management fees, fund his lavish lifestyle and other business ventures, and make over $3 million in Ponzi-type payments to other investors. Villalba concealed his theft from his clients with lies and false account statements reflecting steady gains in their accounts.[2] Based upon these fake statements and believing Villalba was earning impressive returns, investors sent more and more money to Villalba for him to manage on their behalf.

The 26 victims of the fraud, who include the appellants herein, lost more than $30 million.

B. Appellants Invest With Villalba

Appellants (the investors) hired Villalba to manage their money and deposited funds with him at different times between 1996 and 2009.

---

[2] There is no dispute that RCG played no role in creating (and had no knowledge of) these fake account statements.

The investors had different relationships with Villalba and different understandings of how he would manage their money. Bernard Goldberg, for example, met Villalba years before Villalba opened an account at RCG. Goldberg and Villalba formed a general partnership in 1996, through which Goldberg effectively hired Villalba to manage certain assets in return for a share of the trading profits. Given his close, longstanding relationship with Villalba, Goldberg was able to convince many of his friends to hire Villalba as their investment advisor, including (directly or indirectly) all of the other investors in this case.

After being introduced to Villalba, the other investors each entered into Investment Management Agreements (IMA) with Villalba. The IMAs detailed Villalba's role as "investment manager" of individually managed accounts and expressly provided the investor with the right to manage his or her own account and change the investment strategy to conform with his or her investment objectives. The IMAs also gave each investor the right to choose or change the brokerage firm handling the investor's individual account.

The IMAs made no mention of RCG[3] and, by and large, the investors had no knowledge of the brokerage firms that Villalba was using. The investors typically wired money to Villalba by sending money directly to one of his bank accounts. Villalba then transferred money from MMA's bank accounts to futures accounts in MMA's name, including one at RCG, to trade futures. None of the investors sent any money to RCG. Indeed, the investors admitted that they had

---

[3] RCG also had no knowledge of the IMAs.

no interaction whatsoever with RCG, that they never had a written agreement that mentioned RCG, and that RCG played no role in their decision to invest or in the sale of securities.

### C. Villalba's Futures Trading

In June 1998, *18 months after the first of the investors invested with Villalba*, RCG agreed to open a nondiscretionary commodity futures trading account for MMA. RCG is a Futures Commission Merchant (FCM) registered with the Commodities Futures Trading Commission (CFTC) and the National Futures Association (NFA) to conduct trading of futures contracts. As a "nondiscretionary" customer, MMA retained complete control over its futures account and had full responsibility and liability for all trading decisions.

RCG reviewed an offering circular that Villalba prepared to help him solicit $100 million from investors for the MMA account.[4] According to the investment plan described in the circular, funds from Villalba's customers would be pooled to invest in treasury bills or money market funds "within a vehicle similar to a mutual fund." Villalba would also occasionally[5] purchase S&P 500 futures contracts based on his purported expertise in predicting certain market trends. Those transactions would supposedly add 2 percent to 5 percent additional value for his customers. The investment would have "minimal" risk, it asserted, because the futures transactions would be made with "little or no leverage" and stop orders would be used to limit losses.

---

[4] None of the investors ever saw, received, or signed any subscription agreement or offering circular relating to their investment.
[5] The timing was variously described as "a few days per month," "on average a week per month," and "approximately [1]0% of the year."

The circular claimed that the fund was not subject to state or federal regulation. RCG recognized, however, that because it would contain pooled investments, the fund would constitute a commodity pool.[6] That made Villalba, or his company, a commodity pool operator. Neither were registered as commodity pool operators as required by the CFTC.

A form was provided to Villalba with the new account documents identifying two potential exceptions to the registration requirement. RCG's file shows that Villalba selected an exemption that was only applicable if he neither received any direct or indirect compensation for managing the anticipated $100 million pool, nor advertised for participants. The circular stated, however, that he expected to receive management fees from the proceeds and that MMA would be "offering these securities to the public."

RCG's compliance procedures mandate that a new account should not be opened if illegal activity is suspected. After RCG's review of the offering circular and the other information provided by Villalba, it opened the MMA account for trading.

Villalba never followed his purported investment plan. Instead of keeping the investors' money in treasury bills with occasional transactions in S&P 500 futures contracts, Villalba traded futures with RCG almost daily. Also, the trades were highly leveraged and risky. The promised "stop orders" to limit losses were not used. Single day losses of more than $100,000 were not uncommon and, in March 2008 alone, the MMA account lost more than $9 million.

---

[6] A "commodity pool" or "pool" is "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1). Essentially, it is the futures industry-equivalent of a mutual fund.

Villalba's scheme began to unravel in 2009, after he suffered significant trading losses, making it difficult for him to pay investors as they requested their money back. Villalba closed his RCG account in June 2009. Around that time, Villalba opened a new futures account at a different firm. In early September 2009, Villalba started ignoring his clients' phone calls and e-mails, arousing their suspicions. By September 2010, after an investigation by the Securities and Exchange Commission and the Federal Bureau of Investigation, Villalba pleaded guilty to felony wire fraud and was ordered to pay over $30 million in restitution and sentenced to almost nine years in federal prison.

### D. The CFTC investigates RCG

Shortly after Villalba was convicted, the CFTC investigated RCG's role in Villalba's fraud. In April 2012, RCG entered into a consent order with the CFTC related to its handling of the MMA account. The CFTC found that RCG ignored many "red flags" appearing in the account records and that it should have acted in light of "the lack of regard for trading losses, commissions, and fees in the MMA account." As part of the settlement offer underlying the order, RCG did not admit or deny these findings.[7]

---

[7] As the trial court below recognized, such consent judgments are not admissible evidence of the allegations stated therein. See In re Platinum and Palladium Commodities Litigation, 828 F. Supp. 2d 588 (S.D.N.Y. 2011) (striking references to a CFTC order from civil complaint); Carpenters Health & Welfare Fund v. The Coca-Cola Co., 2008 WL 9358563, *3 (N.D. Ga. Apr. 23, 2008) (a consent judgment "falls squarely into the class of evidence deemed inadmissible pursuant to Rule 408"). This is so because of the "high public policy value of encouraging entities . . . to settle their disputes with . . . governmental agencies," and the "chilling effect" that "would likely" result from admitting the consent judgment as evidence of wrongdoing by private litigants. Coca-Cola, 2008 WL 9358563, at *3; see also In re Blech Sec. Litig., 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003); N.J. Turnpike Auth. v. PPG Indus., Inc., 16 F. Supp. 2d 460, 474 (D.N.J. 1998).

E. Procedural history

The investors filed a motion for summary judgment, seeking a ruling that their transactions with Villalba were securities under multiple state securities acts, including the The Securities Act of Washington, chapter 21.20 RCW, and the Ohio Securities Act, chapter 1707 Ohio Rev. Code Ann. The trial court granted that motion, except as to the investments made by Goldberg.[8]

RCG filed two summary judgment motions. The first sought a ruling that claims for some transactions were barred under the Ohio and California statutes of repose. The investors conceded the claims under California's securities act, but contested the applicability of the Ohio provision. That motion was not decided because the trial court granted RCG's second motion for summary judgment in an order that: (1) ruled that the investors could bring claims under the Ohio securities act, (2) dismissed the investors' securities claims, holding that RCG could not be secondarily liable for Villalba's violations of the securities acts, and (3) dismissed the investors' claims for negligent supervision of the account and violation of the Washington Consumer Protection Act. The trial court did not rule on RCG's claim that the state securities acts were preempted by the Commodities Exchange Act.

Prior to the filing of the summary judgment motions, RCG moved the trial court for a protective order from the investors' discovery inquiries concerning RCG's suspicious activity monitoring and investigation practices, particularly regarding the MMA account, under the federal Bank Secrecy Act (BSA), 31

---

[8] The court ruled that his investments were not securities.

U.S.C. § 5318(g). The court entered that order on March 9, 2015. The investors then moved the court to modify the protective order. On April 23, 2015, the trial court modified the protective order to exclude from its scope any information that was already publicly available or in the investors' possession. The investors also appeal from that modified order.

II

The investors contend that the trial court erred by granting summary judgment dismissal of their state securities claims. This is so, they assert, because RCG is secondarily liable to the investors under the Washington securities act for its role in Villalba's fraud. We disagree.

Our review is de novo. Lokan & Assocs., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013). When reviewing an order granting summary judgment, we engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Brown v. Brown, 157 Wn. App. 803, 812, 239 P.3d 602 (2010). "Summary judgment is appropriate if the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Keithly v. Sanders, 170 Wn. App. 683, 686, 285 P.3d 225 (2012) (citing CR 56(c)).

The investors claim that RCG is liable under RCW 21.20.430, subsections (1) and (3).

RCW 21.20.430(1), which pertains to seller liability, provides, in pertinent part:

> Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010, 21.20.140 (1) or (2), or 21.20.180 through 21.20.230,[9] is liable to the person buying the security from him or her.

"'[L]iability may be imposed [under this provision] on a person in addition to the immediate seller if the person's participation was a *substantial contributive factor* in the violation.'" Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 130, 744 P.2d 1032, 750 P.2d 254 (1987) (emphasis added) (quoting Uniform Securities Act, § 605 cmt., 7B U.L.A. 81 (Supp. 1987)).

RCW 21.20.430(3), which pertains to participant liability, provides, in pertinent part:

> [E]very broker-dealer . . . who *materially aids* in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.[10]

(Emphasis added.)

Thus, to establish their claims under this provision, the investors were required to show (1) that they purchased "securities," (2) that Villalba violated the securities laws when he sold those securities to the investors, and (3) that RCG's

---

[9] Application of this subsection is triggered by Villalba's violation of RCW 21.20.010 (securities sales involving fraud or deceit) and RCW 21.20.140 (sales of unregistered securities).

[10] Liability under subsection (1) generally stems from being a seller/buyer, whereas liability under subsection (3) generally stems from a party's formal relationship to a seller/buyer. However, as our Supreme Court recognized in Haberman, 109 Wn.2d at 133, by expanding seller liability to cover parties who were not actually sellers/buyers, but who substantially contributed to the sales transaction, it created significant overlap between the parties liable under each of the subsections.

involvement with the scheme was sufficient for secondary liability under either the "substantial[] contribut[ion]" standard or the "material[] aid" standard.

Although the parties focus on the third component of the investors' claims, we begin by briefly addressing the first two components, which help identify the securities transaction to which RCG must have substantially contributed or given material aid. As to the first component, "a security [is defined] as (1) an investment of money (2) in a common enterprise and (3) the efforts of the promoter or a third party must have been fundamentally significant ones that affected the investment's success or failure." Ito v. Int'l Corp. v. Prescott, Inc., 83 Wn. App. 282, 291, 921 P.2d 566 (1996) (citing Cellular Eng'g Ltd. v. O'Neill, 118 Wn.2d 16, 26-31, 820 P.2d 941 (1991)). The trial court granted the investors' motion for summary judgment, ruling that the investors (except Goldberg) purchased securities when they provided money to Villalba's MMA program. No appeal was taken from that decision. Regarding the violation question, it is uncontested that Villalba violated the Washington securities act by selling unregistered securities and defrauding the investors.

As to the contribution standard, in Hines v. Data Line Systems, Inc., 114 Wn.2d 127, 149, 787 P.2d 8 (1990), the controlling case on this subject, our Supreme Court held that service providers, such as RCG, are not a "substantial contributive factor" in a securities offering (i.e., not a "seller"), absent some level of "active participation" in the sales transaction itself. Thus, even though the law firm in Hines had advised the issuer of the security, the court held that it was not

a "seller" because it had no "personal contact with any of the investors [and was not] in any way involved in the solicitation process." Hines, 114 Wn.2d at 149.

We have consistently interpreted Hines to mean that a service provider is not a "seller" under the law unless it "take[s] . . . part in the actual sales process by acting as the 'catalyst' between the [seller] and the [purchaser]." Brin v. Stuzman, 89 Wn. App. 809, 830, 951 P.2d 291 (1998). Indeed, "'but for' causation alone does not satisfy proximate causation" of the securities sales transaction. Brin, 89 Wn. App. at 830 (citing Haberman, 109 Wn.2d at 131); accord Viewpoint-North Stafford LLC v. CB Richard Ellis, Inc., 175 Wn. App. 189, 197, 303 P.3d 1096 (2013) (referring purchasers to an investment company was not a "substantial contributive factor" in the sale); Shinn v. Thrust IV, Inc., 56 Wn. App. 827, 851, 786 P.2d 285 (1990) (same).

No Washington appellate court has opined in any significant way on the "materially aids" standard. However, other courts interpreting identical provisions have required the material aid to be given in the course of the sales transaction.[11] See, e.g., Benton v. Merrill Lynch & Co., 524 F.3d 866, 871 (8th Cir. 2008) ("It is not enough for the investors to allege [financial institution] was [investment manager]'s broker-dealer; they must also allege [financial institution] materially aided *in the sale* of the promissory notes." (emphasis added)); Katz v. Sunset

---

[11] There does not appear to be similar consistency with regard to the quality of actions that might constitute "material[] aid[]." Compare In re Nat'l Century Fin. Enters., Inc., 846 F. Supp. 2d 828, 890 (S.D. Ohio 2012) ("Establishing that the act of assistance was material can be satisfied by showing, among other things, the act influenced or induced the decision to purchase." (citing analogous statutes in several states)) with Nicholas v. Saul Stone & Co. LLC, 1998 WL 34111036, *19 (D.N.J. June 30, 1998), aff'd, 224 F.3d 179 (3d Cir. 2000) ("To establish liability on the part of a broker-dealer for 'materially aid[ing]' in the sale of a security, the plaintiff must demonstrate that the broker-dealer's involvement in the sale is 'considerable, significant or substantial.'" (alteration in original) (quoting Schor v. Hope, 1992 WL 22189, at *6 (E.D. Pa. Feb. 4, 1992))).

Fin. Servs., Inc., 650 F. Supp. 2d 962, 969 (D. Neb. 2009) ("The . . . [c]omplaint is devoid of allegations that [broker-dealer] took any action that could be construed as aiding [investment manager]'s *sale* of promissory notes to Plaintiffs." (emphasis added)); Nicholas v. Saul Stone & Co. LLC, 1998 WL 34111036, *19 (D.N.J. June 30, 1998), aff'd, 224 F.3d 179 (3d Cir. 2000) (analogous provision "requires that the offender must . . . 'materially aid' *in the sale* of th[e] securities" (emphasis added)).

Thus, under either subsection, the substantial contribution must be made, or the material aid given, in the course of the sales transaction. This insight forecloses both of the investors' claims. RCG did not participate at all in Villalba's sale of interest in MMA to the investors. The investors admit that RCG did not factor into their decision to invest with Villalba. RCG did not issue, promote, or solicit the sale of alleged securities and, in fact, had absolutely no contact whatsoever with the investors. The securities sales were completed well before Villalba would send any money to an account at RCG to trade futures. Thus, RCG's role in the sale of the relevant securities was insufficient as a matter of law.

Because RCG had no involvement whatsoever with Villalba's sale of securities, the trial court's order granting summary judgment dismissal of the investors' Washington securities act claims was proper.

III

The investors also brought claims pursuant to the Ohio securities act. RCG contends that these duplicative claims are barred by Washington's well-

established conflict of laws principles. This is so, it asserts, because claims may be brought pursuant to only one state's laws and, in this case, Washington law applies.

In general,

> [w]hen parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis. Burnside v. Simpson Paper Co., 123 Wn.2d 93, 100-01, 864 P.2d 937 (1994). When the result of the issues is different under the law of the two states, there is a "real" conflict. Pacific Gamble Robinson Co. v. Lapp, 95 Wn.2d 341, 344-45, 622 P.2d 850 (1980). The situation where laws or interests of concerned states do not conflict is known as a "false" conflict. Burnside, 123 Wn.2d at 101. *If a false conflict exists, the presumptive local law is applied.* Rice v. Dow Chem. Co., 124 Wn.2d 205, 210, 875 P.2d 1213 (1994).

Seizer v. Sessions, 132 Wn.2d 642, 648-49, 940 P.2d 261 (1997) (emphasis added); accord Woodward v. Taylor, 184 Wn.2d 911, 918, 366 P.3d 432 (2016) ("If there is no actual conflict, the local law of the forum applies and the court does not reach the most significant relationship test."); Rice, 124 Wn.2d at 210 ("To engage in a choice of law determination, there must first be an actual conflict between the laws or interests of Washington and the laws or interests of another state. Burnside[, 123 Wn.2d at 100-01]. Where there is no conflict between the laws or interests of two states, the presumptive local law is applied. Burnside, at 101.").

The investors acknowledge that there is no actual conflict between the Washington and Ohio securities laws.[12] Yet, they assert that the result of the

---

[12] Indeed, the statutes share the same interest of protecting investors.

lack of conflict is that both laws apply. This, however, is not an option in the standard framework.[13]

In effect, the investors are arguing for the adoption of the so-called "Blue Sky exception." See Danielle Beth Rosenthal, Navigating the Stormy Skies: Blue Sky Statutes & Conflict of Laws, 2:1 STAN. J. COMPLEX LIT. 96 (2014). Under the Blue Sky exception, state securities laws, also known as Blue Sky laws, are treated as "additive rather than exclusive." Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp., 2012 WL 1322884, *2 (C.D. Cal. April 16, 2012). In other words, just as a litigant can bring claims under both state law and federal law, under the Blue Sky exception, so can a litigant can bring claims under multiple state's securities laws. Simms Inv. Co. v. E.F. Hutton & Co., 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("[T]he securities laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question."); Lintz v. Carey Manor Ltd., 613 F. Supp. 543, 551 (W.D. Va. 1985) ("Just as the same act can violate both federal and state law simultaneously, or a state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously."). The Blue Sky exception appears to be the strong majority rule. See Countrywide, 2012 WL 1322884, at *2 (referring to the "growing weight of authority" applying the exception). However, no Washington appellate court has directly addressed whether claims may be brought under multiple states' securities laws.

---

[13] RCG's contentions are similarly muddled. It asserts both that there is an actual conflict between the securities law of Washington and Ohio and that the outcome is the same under both statutes (namely, that RCG is not secondarily liable for Villalba's fraud). Because an actual conflict of laws requires that "the result of an issue is different under the laws of the interested states," Woodward, 184 Wn.2d at 918, these positions are internally inconsistent.

The Washington case closest to the point is FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 331 P.3d 29 (2014). In that case, a Washington purchaser asserted claims under the Washington securities act against a New York seller. FutureSelect, 180 Wn.2d at 959. The New York seller moved to dismiss, arguing that New York securities laws, which do not recognize a private cause of action, controlled the plaintiff's claim. FutureSelect, 180 Wn.2d at 959. Given the actual conflict, the court engaged in a full-scale conflict of law analysis, weighing the contacts with each state and each state's interest in the dispute. FutureSelect, 180 Wn.2d at 967. The court ultimately concluded that "Washington has a more compelling interest in protecting its investors from fraud and misrepresentation than [the seller's state] does in regulating sellers of securities that may have perpetrated [a] fraud or misrepresentation in another state." FutureSelect, 180 Wn.2d at 970.

RCG contends that, by engaging in a full conflict of law analysis, the FutureSelect court implicitly rejected the Blue Sky exception. Adopting the investors' position, it asserts, would render unnecessary the conflict analysis engaged in by the FutureSelect court. The investors contend, by contrast, that FutureSelect is inapposite. A conflict analysis was required therein, they assert, only because the New York securities law was offered to defeat the Washington law claim, rather than to supplement it.

In truth, the FutureSelect opinion permits of both parties' readings. Thus, there is no determinative Washington law on this issue.

As we demonstrate below, the result in this case would be the same regardless of whether we decide this issue. Because it is unnecessary to the case's resolution, our pronouncement—were we to make one—would be mere dicta. For this reason, we decline to further address the question of the applicability of the Blue Sky exception in Washington.

IV

The investors further contend that RCG is also liable under the Ohio securities act. This is so, they assert, because it "participated or aided" Villalba in making the sale. We disagree.

The Ohio securities act extends secondary liability for securities violations to those who "participated in" the illegal sale or "aided the seller in any way."

> [E]very sale or contract for sale made in violation of [the securities law] is voidable at the election of the purchaser. The person making such sale or contract for sale, *and every person [who] has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser,* . . . unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

OHIO REV. CODE ANN. § 1707.43(A) (emphasis added).

The crux of secondary liability under section 1707.43 of the Ohio securities act is participation or aid by the defendant in "making [the] sale." OHIO REV. CODE ANN. § 1707.43(A). Although section 1707.43 extends liability to non-sellers, the act "do[es] not impose liability on anyone who aided the seller 'in any way.' Rather, [it] impose[s] liability on anyone who aided the seller in any way *in making an unlawful sale or contract for sale.*" In re Nat'l Century Fin. Enters., Inc. Inv. Litig., 2006 WL 2849784, *10 (S.D. Ohio Oct. 3, 2006).

- 16 -

The recent Ohio appellate court decision in Wells Fargo v. Smith, 2013 WL 938069 (Ohio Ct. App. Mar. 11, 2013), makes clear the importance of the sales transaction. Therein, the court analyzed and synthesized all of the Ohio cases applying Section 1707.43(A). Wells Fargo, 2013 WL 938069, at *5-6. The court found that Ohio courts consider "several factors in deciding whether a person or entity shall be responsible for the sale of illegal securities under [OHIO REV. CODE ANN.] 1707.43(A)," all of which are directly connected to "making such sale", including: (i) "relaying information, such as the proposed terms of the sale, from the sellers to the investors," (ii) "arranging or attending meetings between the investors and the sellers," (iii) "collecting money for investments," (iv) "distributing promissory notes and other documents to the investors from the sellers," (v) "distributing . . . payments to the investors," and (vi) "actively marketing the security or preparing documents to attract investors." Wells Fargo, 2013 WL 938069, at *5.

As was explained above, in the context of the discussion of liability under the Washington securities act, the investors did not proffer any evidence that RCG "participated or aided" Villalba in "making [the] sale" of securities to them. Thus, even if the Ohio securities act were applicable to this case, summary judgment dismissal was properly granted on the investors' section 1707.43(A) claims.

Because each of the investors' securities claims fails, as explained above, determination of the conflict of law issue is unnecessary to the resolution of this

case and any explanation offered in response to that issue would constitute only dicta.

V

The investors also contend that RCG is liable to them in tort for its role in Villalba's fraud. This is so, they assert, because RCG's negligent supervision of the MMA account facilitated Villalba's fraud. We disagree.

A negligence action may proceed only if the plaintiffs can establish that (1) a duty of care was owed to them by the defendant; (2) there was a breach of that duty; (3) that breach was the cause of their harm; and (4) they suffered injury as a result. Keller v. City of Spokane, 146 Wn.2d 237, 242, 44 P.3d 845 (2002). The only element at issue herein is the existence of a duty of care.

Our Supreme Court has repeatedly made clear that "there is no duty to prevent a third party from intentionally harming another unless a 'special relationship exists between the defendant and either the third party or the foreseeable victim.'" Niece v. Elmview Grp. Home, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)); accord Folsom v. Burger King, 135 Wn.2d 658, 674-75, 958 P.2d 301 (1998) (absent a special relationship "no legal duty to come to the aid of a stranger exists"); RESTATEMENT (SECOND) TORTS § 315.

Consistent with this principle, Washington follows the rule that financial institutions do not owe a duty of care to protect non-customers from fraud. See, e.g., Zabka v. Bank of Am. Corp., 131 Wn. App. 167, 173, 127 P.3d 722 (2005)

- 18 -

(bank owed no duty to defrauded investors absent a direct relationship). <u>Zabka</u> illustrates the strength of this rule. Therein, investors sued Bank of America (BA) in tort for its alleged role in a fraud perpetrated by one of the bank's customers using an account at the bank. We held that the investors' negligence claims were properly dismissed for failure to state a claim because the bank owed no duty to the investors, with whom it had no relationship. This was our holding despite evidence to support a finding that the bank had failed to meet certain procedural and monitoring requirements with respect to the account. As we stated:

> There is evidence that BA failed to follow standard procedures and monitor transactions according to its own internal standards. BA's failures may have facilitated the theft of the Zabkas' money, but BA did not have a duty to prevent their loss. The trial court correctly dismissed the negligence claims on a CR 12(b)(6) motion.

<u>Zabka</u>, 131 Wn. App. at 173.

Our approach is in accordance with that taken across the country. Indeed, every court to address the precise issue presented herein has held that FCMs owe no duty to protect non-customers from a customer's fraud. <u>See, e.g.</u>, <u>Spitzer Mgmt., Inc. v. Interactive Brokers, LLC</u>, 2013 WL 6827945, *4 (N.D. Ohio Dec. 20, 2013) (FCM did not owe any duty of care to non-customer plaintiffs who lost money in a Ponzi scheme); <u>In re Agape Litig.</u>, 681 F. Supp. 2d 352, 357-58, 360 (E.D.N.Y. 2010) (same); <u>Nicholas</u>, 1998 WL 34111036, at *22 (same); <u>Kolbeck v. LIT Am., Inc.</u>, 923 F. Supp. 557, 571-72 (S.D.N.Y. 1996), <u>aff'd</u> 152 F.3d 918 (2d Cir. 1998) (same); <u>see also</u> <u>Frederick v. Smith</u>, 7 A.3d 780, 783-84 (N.J. Super. 2010) ("[A] brokerage firm is under no obligation to be a fraud

watchdog for non-customers."); <u>Bottom v. Bailey</u>, 767 S.E.2d 883, 896-87 (N.C. App. 2014) (a broker has no legal duty to "supervise" or "monitor" the investments of its customers to protects is customer's clients from fraud); <u>accord</u> <u>Unity House, Inc. v. N. Pac. Inv., Inc.</u>, 918 F. Supp. 1384, 1392-93 (D. Haw. 1996) (treating as well-established under Washington law that a brokerage firm has no duty to its own customers—much less non-customers—to prevent unsuitable trading in a nondiscretionary account).

Herein, the evidence established that the investors were not customers of RCG and never did business with RCG. The investors admitted that they had no contact with anyone at RCG before the scheme collapsed and never sent any money or documentation to RCG. In short, the investors had no relationship with RCG, let alone a "special relationship" pursuant to which RCG might have owed them a duty.

Despite their lack of direct connection to RCG, the investors contend that RCG owed a duty—to them—to police the activity and trading in the MMA account. The investors' argument in this regard relies on <u>Garrison v. Sagepoint Fin., Inc.</u>, 185 Wn. App. 461, 345 P.3d 792, <u>review denied</u>, 183 Wn.2d 1009 (2015). Therein, we held that AIG Financial Advisors Inc., a securities broker-dealer, could be responsible for negligently supervising the transactions of an employee who was also acting as an independent investment advisor. <u>Garrison</u>, 185 Wn. App. at 484-85; <u>accord</u> <u>McGraw v. Wachovia Sec., LLC</u>, 756 F. Supp. 2d 1053, 1075 (N.D. Iowa 2010) (case upon which <u>Garrison</u> significantly relied).

This case does not involve the particular factual scenario addressed in Garrison. The investors were Villalba's customers, for sure, but Villalba was not RCG's employee and registered agent. Rather, Villalba was RCG's customer or, more precisely, he was the manager of RCG's customer. Thus, the investors' reliance on Garrison is misplaced.

Because RCG owed the investors no special duty to supervise Villalba, the trial court's order granting summary judgment dismissal of the investors' negligence claim was proper.

## VI

The investors also challenge the trial court's protective order, asserting that it improperly prevented them from obtaining relevant information from RCG in the discovery process. Because the information was privileged pursuant to the BSA, we disagree.

The investors served RCG discovery requests for information regarding the opening of the MMA account, what RCG did to monitor the account, and any actions it took with respect to the account. While these requests were pending, RCG filed a motion seeking a protective order prohibiting the investors from "conducting discovery relating to RCG's internal investigations and monitoring of suspicious activity," including: (1) RCG's inquiries and monitoring of Villalba and the MMA account specifically; (2) RCG's practices and methods of investigation and monitoring generally; or (3) The identities of RCG employees charged with suspicious activity monitoring and investigations.

The motion contended that this discovery was prohibited under the BSA.

The BSA requires that banks and other financial institutions report certain types of suspicious activity to the federal government in a suspicious activity report (SAR). 31 U.S.C. § 5318(g)(1). The act affords a privilege to the federal government, allowing it to keep these reports confidential, and prohibits disclosure by others of the actual SARs, or other information indicating that an SAR was filed.

The requested order was granted but, pursuant to the investors' motion for reconsideration, the trial court modified the order so that it would not apply to "materials which are already publically available from prior litigation on the MMA account against RCG." The investors contend that the modified order was also erroneous.

We review de novo issues interpreting the privilege provided by the BSA. Norton v. U.S. Bank, 179 Wn. App. 450, 324 P.3d 693, review denied, 180 Wn.2d 1023 (2014).

The trial court's protective order mirrored the order that we affirmed in Norton, a case substantially similar to this one, except that it involved a bank, rather than an FCM.[14] Therein, this court held that a financial institution "may not be ordered to describe or disclose its internal investigations, either generally or those specifically related" to a Ponzi scheme. Norton, 179 Wn. App. at 461-62. As FCMs are expressly included in the BSA's definition of covered "financial institutions," 31 U.S.C. §§ 5312(c)(1)(A), 5318(g), the BSA's protections apply

---

[14] The protective order affirmed in Norton applied to information related to the bank's monitoring practices and internal investigations "generally or those specifically related" to the activity in question. 179 Wn. App. at 462. By comparison, the order at issue herein protected information related to RCG's "practices and methods of investigation and monitoring generally" and "inquiries and monitoring of Villalba and the MMA account specifically."

equally to RCG as to the bank in <u>Norton</u>.[15]

The trial court's order, which was compelled by our decision in <u>Norton</u>, was proper.

Affirmed.

We concur:

---

[15] We are unmoved by the investors' contention that the outcome should be different in this case than in <u>Norton</u> based on differences in the regulations applicable to FCMs versus banks. Even were we to accept the investors' assertion that FCMs in general are exempted by regulation from some SAR reporting requirements as a member of the NFA, RCG was nevertheless required to make these reports. <u>See</u> NFA Interpretive Notice 9045, "NFA Compliance Rule 2-9; FCM and IB Anti-Money Laundering Program."